We'll hear argument next in Case No. 15-606, Pena-Rodriguez v. Colorado. Mr. Fisher. Mr. Chief Justice, and may it please the Court, roughly half the trials in this country, from New York to California to South Carolina, are already conducted under the rule we seek today, namely a requirement that judges consider evidence of racial bias when it's offered to prove a violation of the Sixth Amendment right to an impartial jury. This Court should require Colorado to follow the same rule. Indeed, Colorado already has a turnkey system for implementing an exception to racial bias. Like every other jurisdiction across the land, Colorado already has multiple exceptions to the principle of jury secrecy. So all Colorado has to do is use that same system already in place to administer an exception for racial bias. What about religious bias? Same thing in this case, except it's not, you know, this is how Mexicans act, this is how Catholics or Jews act. So they're obviously guilty. Wouldn't that also come under your exception? Well, there's obviously, Mr. Chief Justice, frequently an overlap between race and religion, and so for that reason, religion might be viewed very similarly to race. All right. Well, that seems to be avoiding the question. Let's say there isn't. I don't know. Catholics. All the Court needs to decide in this case today is race. No, I don't think that's fair. Once we decide race, this is not an equal protection case. It's a Sixth Amendment case. So we think invocation of race is impermissible enough, I guess, that we will pierce the jury confidentiality. Well, the next case is going to be religion. So whatever we say on race is going to have to have either a limiting principle that makes sense, or it's going to open up a broad category of cases. I don't deny that there may be subsequent cases if you decide this one in my favor, but I'm saying two things to the Court. First of all, you can and should do what the Court's done in previous situations like this, which is start with race. And the reason why is because the Court has said time and again in cases like Rose v. Mitchell, in cases like Ham v. South Carolina, that race is different.  It is a unique state in which the Court has said that race is unique. Alito, you're not being very helpful to the Court in your answers. Suppose we start with race, and then the next case involves religion. Now, how would you distinguish religion from race if we were to reach an opposite conclusion in the religious case? What you would do in that case, Justice Alito, is conduct the same analysis you're being asked to conduct here, which is look at the Tanner factors and ask how effective other safeguards are in rooting out. Sotomayor, why? Why? Why would you ask that question? Why? I mean, you know, the Chief says this is not an equal protection case. But the Sixth Amendment applies to the States through the Fourteenth Amendment, correct? Yes. I always thought the most pernicious and odious discrimination in our law is based on race. I agree with that. All right. Sotomayor, so why is a rule that says, given the exceptions we've recognized since the 1800s that have said that race is the most pernicious thing in our justice system, why can't we limit this just to race, using principles of the Fourteenth Amendment as well? I'm not denying that you can. And, of course, the Constitution needs to be read structurally. So not only is it the States' fault. Roberts, do you think it's odious to have the same sort of discrimination against someone because he's Muslim or practices Islamic faith? You're saying he's a Muslim. Of course, you know, given this, I know how Muslims behave, he committed this crime. Is that not sufficiently like racial discrimination that it should be carved out? It may well be, Your Honor. It certainly is odious. And so I'm not trying to give you an answer. Roberts, do you think it's odious to have a speech in the jury room about sexual orientation and how particular types of people are more likely to commit crimes like the one before them? Is that sufficiently odious? It's quite odious, but whether it would satisfy the balancing test we're setting forth today would be needed to decide on its own terms. You have to have an answer for this reason. No one on the other side thinks anything but this is terrible jury misbehavior. That's a given across the case. It is not a question of the validity of the behavior. It's invalid. The question is the timing of when somebody has to object. And their point is they have to object before the verdict comes in, because if you don't have that rule, you will, in fact, open the door to all kinds of evils which they mention. All right? That's their argument. So what we're really asking for is your reply to that argument. And it doesn't really reply to say maybe you're going to have a bunch of other things too, because then that strengthens their argument. And on the other hand, maybe that's what you think. I mean, the whole question is, is that inevitably opening the door to these other things, which will mean tell the jury, jury, if somebody says a racist comment, write me a note, the judge says, before you reach a verdict. And you get the point? That's why the question is being asked. And so that's why I, too, would like an answer. Fisherman So I think you've asked a more specific question about objecting and then the more general question that we've been talking about, about drawing lines. So for objecting, let me just say, it's impossible for the defendant to object to the misconduct in this case because the defendant is not in the jury room to hear it. And there's never been a right that depends on the jury. The jurors themselves. Sotomayor Please concentrate on the question Justice Breyer has asked you. Fisherman I'm sorry. Okay. Sotomayor Which is, answer his question. He's talking about the general principle. He says everybody's afraid to open the door. All right? And to the extent that your answer is simply the door is open once you rule for me, because other bias is going to be viewed the same, it's going to hurt you. That's what Justice Breyer said. So tell me why that fear is not valid. Fisherman I think there's two reasons why. One is you can look at the Court's cases that I've described already, things like Rose v. Mitchell, Hamm v. South Carolina, where we have race-specific rules that have never been extended beyond race. And the second reason is because I know this isn't, strictly speaking, an equal protection case, but the same values of the Fourteenth Amendment infuse the Sixth Amendment. And I think a helpful analogy can be drawn to the tiers of scrutiny. Ginsburg Why isn't this national origin? I mean, you say you're trying to isolate race, but this was the case of Mexican-Americans. So why doesn't it belong under national origin rather than race? Fisherman Well, I think the Court's case law has fused the two concepts, particularly when it comes to people of Hispanic origin. And so like the parties, and I think the government and everybody agrees, race and ethnicity is interchangeable in this case. But if I could continue my answer about the analogy to the tiers of scrutiny, it's not that the other ethnic groups, it's only true with respect to Hispanics. Fisherman Well, it's most true with respect to Hispanics under this Court's cases, which is why we've used the term race in every other party in court in the case has used the term race. And I think the tiers of scrutiny provide a helpful analogy. It's not that the other ethnic groups are not equal. Kagan You keep on being cut off before you get to the tiers of scrutiny. But the cases where the Court has said that a lawyer has to be allowed to ask on voir dire about bias, does that – is that only true of racial bias, or is that true of any other kind of bias as well? Fisherman Under this Court's case, it's only race. And remember, Ham was decided in 1973, so there's been plenty of time for that issue to percolate. And I don't know of any lower court decisions that have included race. Kagan And then – Kagan I'm sorry. Is that – is that right? Fisherman I'm sorry? Kagan It's just race, you're saying? Fisherman I believe so. Kagan It's just race. And then Batson would be race and gender. Is that right? Fisherman That's right. And I think Batson is another helpful analogy. First of all, in Batson itself, he wrote an opinion about race. And of course, the question of gender came back several years later. There were three dissenters in that case. It didn't automatically follow from the first. And there was a different analysis that I would suggest you would conduct here as well. You'd ask about the Tanner factors and the other factors the State has pointed out. Things like the composition of ordinary juries look very different when you're talking about sex than race. Things like – Ginsburg Is it so different? Suppose somebody in the jury room, say it's an automobile accident, says, what do you expect of women drivers? Women shouldn't be allowed to drive cars. Every woman I know is a terrible driver. Suppose that was what was said. Fisherman Well, you would ask the same questions we're asking today, but you'd ask it through a different record and a different set of balancing. You might conclude, and I'm not going to deny this, the Court might conclude, as it did in Batson, that you should extend to sex. But you might not conclude that, and that would be a separate case. And maybe now I can make my tiers of scrutiny point, because, remember, sex discrimination is treated differently under the Equal Protection Clause than race discrimination. And under a similar analogy, it's not that one is more odious than the other or one is better or one doesn't violate the amendment. It's that different tools must be available to root out different kinds of discrimination. And that's the whole point of strict scrutiny, is that we do not leave any stones unturned when it comes to race. Ginsburg Isn't it back true that in the decisions of this Court, those tiers are not what they once were? That is, strict scrutiny is no longer fatal. In fact, and for gender discrimination, you must have an exceedingly persuasive justification for it. Fisher Of course, Justice Ginsburg, that's correct. And I'm just trying to give this Court an analogy that it might use to think about the problem of how to apply the Sixth Amendment to different kinds of alleged bias. Roberts Well, it's not just alleged bias. It's bias based on innate characteristics of the offensive remarks. But the question is, what is most likely to or a significant risk of depriving the defendant of a fair trial? And it seems to me there are statements that have nothing to do with race or gender or sexual orientation or anything that might have a far greater impact. And I'm wondering why we don't allow impeachment of the jury verdict in those cases. Someone, I don't know, comes in and says, look, I know that witness. That witness lies all of the time. Believe me, you can't take anything he says. I mean, that in a certain or particular case could have a greater impact. So why don't we allow impeachment of the jury processes in that case? Fisher I think it's a very important question that goes to the heart of the case, because I think you could have also used the hypotheticals from cases like McDonald v. Pless and Tanner v. Worker. And the reason why is because the Court has said time and again that race is different. There's a difference between a bias, harmful though it may be, that affects only a private litigant. Compared to racial bias, which is a stain on the entire judicial system and the integrity that it's built upon. And that is the difference the Court said in Rose v. Mitchell. It's the difference the Court said in Hammock v. South Carolina. It's what the Court has talked about in its Batson line of cases. It's that stain on the system that the Court said in Hammock v. South Carolina. Breyer What do the 20 States do? Fisher Pardon me? Breyer What do the 20 States do? Fisher The 20 States are actually 18 States and two Federal jurisdictions. But those jurisdictions have all limited their exception to race. That's what you're asking. And remember, some of those exceptions have been around in New York. It's been around since the 60s. In Minnesota, it's been around since the 70s. So we have vast experience in the States. And when all the arguments are made on the other side, which I would respectfully say are all theoretical arguments about the harm that would come from adopting a rule, I'd stress to the Court, this is not a theoretical question. There's an empirical answer that is available to the Court based on the experience across the country from multiple jurisdictions. Alito Race is different for some purposes. But why is it different from other things for Sixth Amendment purposes? What the Sixth Amendment protects is the right to a fair trial, to an impartial jury. And if we allow the exception that you are advocating, what do you say to the other defendant who, the prisoner who is going to be spending the rest of his life in prison as a result of a jury verdict that was determined by flipping a coin? Fisherman, I think I'd give you the same answer I gave to the Chief Justice earlier, which is that is woefully unfair. But when the Court does its balancing of the harm on the one side to the judicial system and the defendant against the State interest, the balance is different when it comes to race. And as bad as ---- Alito Race, how does that connect with the right to an impartial jury? A jury can be partial for racial reasons. It can be partial for some other reason. Fisherman, because the values of the Fourteenth Amendment are read into the Sixth Amendment as well. And if I could give the Court an analogy, think of bowling against sharp, where the Court asked whether the due process clause applies to the Federal government — I'm sorry, the equal protection clause applies to the Federal government, which it doesn't by its terms. But the Court said, you know what, the due process clause in the Fifth Amendment does, and that should be infused with the values of equal protection. And the particular harms of racial discrimination should be read into that amendment as well. That's all we're asking here. Ginsburg. Has there been any case other than bowling v. sharp, I mean, bowling v. sharp, the conspicuous absence, was any equal protection principle operative against the Federal government? And I don't know of any case other than bowling v. sharp where you have that kind of reverse incorporation. Fisherman, no, I think, Justice Ginsburg, another example would just be Ham. Remember that the voir dire line of cases are all due process cases. There's nothing in the due process clause that singles out race, but this Court's opinion does. And it says that the structure of the Constitution and the unique problem of race in our history and our society require special medicine. Roberts, do we take the entire body of law that we have developed in connection with racial discrimination when the Equal Protection Clause is the issue and apply that to your case? For example, here you have a very, obviously, offensive and direct appeal to race. What if it's, oh, you know, he's from that neighborhood, I know people from that the people from that neighborhood always commit crimes like this. Now, obviously, that could well be challenged as based on race or, I mean, does that also, do you impeach the jury's, the secrecy of the jury proceedings for something like that? Fisherman, I think the analysis would be similar to what you do under the Equal Protection Clause, but it wouldn't have to be lockstep. And the question that's asked in the 20 jurisdictions that already do this is would a reasonable juror have understood the comments to be about race? Would the jurors have understood the juror who spoke to be asking them to decide the case or view the evidence based on racial bias? And remember, Mr. Chief Justice, that the first is very different from the second. That second — Fisherman, I'm sorry if I miss, if I confuse the Court, but the key when you're talking about people such as from that neighborhood are whether or not it would be understood as race-based comments as opposed to something else. So it's a similar question. Sotomayor, I like the second better, because what otherwise, you're going to have an evidentiary hearing in every allegation. Fisherman, I'm trying to — Sotomayor, but 20 jurisdictions don't, right? Fisherman, right. Sotomayor, there has to be a test that tells you when, what's the difference between a stray remark — Fisherman, right. — and something that has impact. Fisherman, right. And so both are required, Justice Sotomayor, and I'm sorry if I was confusing about that. First, you ask whether or not it was racial bias as opposed to some other kind of bias. Second, you ask whether it went to the evidence in the case and the defendant's guilt or whether it was an off-color joke made during a break or something like that. And let me stress two things. One is the jurisdictions that exist already do this, and even jurisdictions like Colorado already do this. Go back to the first — I think back to Justice Breyer's question. If a juror had sent a note out five minutes before the verdict, in this case or any other describing racial bias, the judge would make all the same inquiries for asking the judge to make. Breyer, I don't see the problem there. What's actually boring me, if I had to write this on paper, somebody could say, well, you know, on request, the defense attorney can get an instruction, send us a note before you reach the jury. That could happen. But you want to go beyond that and impeach the verdict. The real reason, I suspect, is even though we can imagine cases that are just as unfair, flipping a coin, et cetera, that part of the purpose of these amendments is to create a judicial system that is seen as fair beyond the individual case. And indeed, being seen as fair beyond the individual case means that it is more likely to be fair in other cases as well. Now, if I'm really honest, I think, yes, that's probably right. And then the history and everything become relevant. But have you found any support for that? For what exactly, Justice Breyer? That what we're doing here in creating the exception, despite the fact that we can think of Justice Alito's case, which is just as unfair, though it doesn't involve race, is we're trying to create a fairer system in general, and one that will be perceived as such. And there, race is a special problem. So I wonder if you and I, if I could write it that way, I think it would make sense. But I'm asking you, is there support for such a thing? Fisherman, Yes, you almost spoke verbatim out of the Rosales-Lopez opinion, which draws from the Aldridge v. United States opinion in 1931. So this is a principle that goes quite a ways back in the courts' jurisprudence, which is the perception of fairness when it comes to racial bias and racial discrimination is paramount. And, Justice Breyer, if I could add something, if I could add two points about your question, which we return to about what if the jury could be instructed to send a note out? Well, there's two problems with that. First is, remember, the jurors are always instructed, as they were in this case, to use their common-sense experience in the jury room to draw on that. And remember how these comments are couched, as is often the case, as jurors H.C.'s personal experience that Mexican men, blah, blah, blah, blah. And so a jury instruction, at best, is going to be cross-cutting against another jury instruction and not always work. And even in the much easier case of extraneous evidence and improper influence, which are exceptions that Colorado recognizes, as does the Federal system and everyone else, jurors are always instructed not to do those things. And yet, they do sometimes, and the system demands that we give a remedy when jurors don't follow those instructions. Robertson, what is it that the proceeding that you would have, I mean, if we accept your proposal and interview the jurors, subject them to, what do you ask them? So there's two steps, Mr. Chief Justice. First is a threshold showing that I described earlier, that there was a statement that racially was not. And then there's a second step, which is to say, well, what do you do once you have that in the record? What's next? Fisherman So they the judge asked exactly the same question the judge would ask with other kinds of jury misconduct, like extraneous evidence. The judge asked whether there's a reasonable possibility that the verdict was influenced by that bias. Roberts So if the other jurors come in and they testify, you know, there's testimony and everybody says yes, that's what he said, and they say, well, what would you do? But of course the guy was guilty, no doubt about it. And the other 11 say, of course he was guilty. It was very offensive what, you know, H.C. or whatever it was said, but of course he was guilty. Everybody, we agreed to, you know, in five minutes. Fisherman Right. Roberts Does that make a difference? Fisherman So I think you've asked two questions there. The first is, is one juror enough? And the second is, do you look at the strength of the government's case? On the first question, whether one biased juror is enough, the Court's Parker v. Gladden decision in 1966 quite clearly says yes, which of course is in line with the way you treated a multi-member decisionmaking body last term in Williams. Now, the question on whether you look at the strength of the government's case as to whether to grant relief, I will tell this Court that's the one issue on which the 20 jurisdictions across the country are divided. Some say the mere fact that a single racially biased juror took that into account in issuing his verdict is enough for relief, and some other States will look at the overall strength of the government's case. For, I think, obvious reasons, the Court need not resolve that here in this case. And that could come out on that question however it wished. Ginsburg-McCain, Jr.: But specifically, what happens next? The Chief asked the question. Do you have to poll? Do all the jurors have to come back and each one testify? First of all, did H.C. say what the two jurors said he said? There may be doubt about that. And then whether any of them were influenced by it. Fisherman, Jr.: So there's two questions, Justice Ginsburg. The first one is, what does the evidence show? And so some juror testimony is required to bring out who said what and in what context. Once that's determined, the judge asks whether there's a reasonable probability that the verdict was infected by racial bias. And that question, Justice Ginsburg, is purely objective. It's very much like what courts do every day when there's a bad jury instruction. They don't bring all the jurors in and have them testify how they interpreted the jury instruction or the like. They ask an objective test, saying with those improper statements brought into the It's a reasonable probability the juror would have erred in the way they decided  Kagan, Jr. So the idea would be the judge would say, well, look at all this other evidence against the defendant. I think that they would have found him guilty regardless? Fisherman, Jr. No. Well, that's the issue I was talking about with the Chief Justice on which courts are divided. We think the Court might hold in a future case that it's enough to have a racially biased juror and look at the transcript. Kagan, Jr. So that would be a kind of structural error. Fisherman, Jr. That would be a question the Court would ask. What I meant when I said look at the other facts, I meant the context in which a statement was made during deliberation. So it might be that somebody said something and then somebody immediately spoke up and corrected that person. He said, oh, that's not what I meant. I meant something else. And the judge, as they do every day in jurisdictions across the country, would hear this evidence and decide, oh, this juror wasn't actually expressing facial bias. Alito, Jr. Here we have, in this case, we have a very blatant statement. But let's consider the standard that now applies on a lot of college campuses. As to statements that are considered by some people to be racist, what would happen if one of the jurors has the sensibility of a lot of current college students and thinks that one of the – something that's said in the jury room that falls into one of those categories was a racial comment? Fisherman, Jr. We're talking here, Justice Alito, only about intentional racial bias. So even in the Equal Protection Clause, you haven't gotten anywhere near the racial bias. Alito, Jr. Something that is considered improper on a college campus today, and another juror thinks that that shows intentional racial bias. Fisherman, Jr. No. I think, as I said, it's an objective test. Even under the Court's Equal Protection jurisprudence, the Court hasn't tried to do that. Alito, Jr. Well, how will the judge decide? How will the judge decide whether the statement is racist? Fisherman, Jr. Well, I think it's the same analysis the judge would conduct in an Equal Protection case, where the judge would intentionally, on its face, the case based on race. That's all you need to do. Kagan, Jr. Presumably, the judge faces the same situation if a juror comes in during proceedings, is that right? And then the judge has to make that decision whether this is something real or not. Fisherman, Jr. Precisely right, Justice Kagan, or after proceedings. Remember, jurors can walk out the courthouse steps, as they were told in this case. It's entirely proper to discuss the basis for your verdict. So if that afternoon jurors are saying this is how we decided the case, the judge might be asked to make the exact same inquiry. So there's nothing new about the inquiry we're asking. Either in terms of the case itself or the case itself. Ginsburg. Does it make any difference if it were not the jurors as here, but the lawyer for the defense went around, contacted all the jurors, and elicited this testimony? So it wasn't the jurors volunteering, but the lawyer questioning the jurors to see if he can come up with something that would gain a new trial. Fisherman, Jr. So long as what the lawyer was doing comported with the local rules with respect to contacting jurors, it would be the same case. In Minnesota, which is the one place where I think there is a case about a lawyer breaking the rules in terms of talking to a juror, there's a situation where it's a different case than this, and the judge might deny relief, if I could reserve the remainder of my time. Roberts. Thank you, counsel. Mr. Yarger. Yarger. Thank you, Mr. Chief Justice, and may it please the Court. Everyone, including Petitioner, agrees that the citizen jury system requires safeguards to ensure full and fair debate in the jury room and to prevent juror harassment and tampering after verdicts are handed down. The jurors' alleged statements in this case are no doubt reprehensible, but the vital interests that the no-impeachment rule serves apply just as readily here as they do in other serious alleged cases of juror misconduct and bias. And Petitioner has not shown Mr. Yarger, let's assume that that's true, that the State interests are basically the same, and also let's assume that the safeguards in this vordeer don't operate particularly differently. All right? So I'll just give you what I think is the strongest argument on Mr. Fisher's side, which is that the interests in preventing unfairness of this kind are much greater. That that's really the difference, is the fact that verdicts based on race discrimination pose a harm, that verdicts based on other kinds of unfairnesses, which exist in the world, and are terrible, but still that it's just not the same kind of harm. And we certainly don't dispute that racial bias is a particular problem and a particular problem under the Constitution, but I don't think it's correct that other forms of bias won't cause the same types of institutional harms. Of course, this Course recognized that in J.E.B. v. Alabama, when it extended Batson two claims of gender bias. And certainly, a verdict based on the fact that a defendant is a Muslim or a Catholic or a Mormon or any religious group would just as significantly call into question the one question is whether identity-based harms are different than other kinds of unfairnesses, as we've talked about in the Warger case, for example, or the one before that. And then another question is whether race, racial bias is different from other identity-based bias, right? But would you concede that identity-based bias is different from, like, you know, the kinds of bias that we've discussed in other cases? I wouldn't concede that in this specific context, where you're dealing with an individual defendant's Sixth Amendment right to an impartial jury in a fair trial set against the important and vital interest that the no-impeachment rule serves to allow the jury to do its job. Kagan. Well, it's true that this is a Sixth Amendment case, but it seems artificial not to think about the Sixth Amendment issue as informed by the principles of the Equal Protection Clause. And those principles, as we've always understood them, says that there's a special kind of harm in treating people worse and, I mean, certainly in punishing people because of their race. You know, maybe especially because race is so associated with particular stereotypes, respecting criminality. That's about the worst thing that you can do to a person, and it's also the worst thing that you can suggest about the criminal justice system, that it allows that to happen. So both of those two things, the harm to the individual for being punished because of your race and the harm to society writ large. And that would, I think, be the – it's like, yes, you're right, the State interests are exactly the same when voir dire functions pretty similarly, but it's just a different kind of harm. I think it would be difficult in the context of the Sixth Amendment, in the same courthouse in Colorado, to tell one defendant that that defendant gets to impeach the verdict because the error that happened to occur during deliberations was racial, whereas across the hall it was religious or it was simply the jurors disrespecting their jury system enough to flip a coin. And that's the problem in all of these cases in which Rule 606b is going to apply. You're going to be putting the individual defendant's Sixth Amendment right, which Petitioner acknowledges can be implicated in a wide range of cases, against the interests that, Justice Kagan, I think you acknowledge are weighty and important and precisely why Rule 606b has survived for so many years. Kennedy, suppose this were a capital case. Would the government of the United States come and make this argument, that the person can be executed despite what we know happened in the jury room? Well, Your Honor, I think the – certainly this isn't a capital case, and that might raise different issues. There are cases set in the briefing that are capital cases in which Rule 606b does apply. Well, I mean, it seems to me to follow from your position. And it does. And our position is it should apply there. If the jury system is so important to be protected in these other contexts and is – and this rule is necessary to allow them to fully and fairly deliberate the issues, it ought to apply in that context as well. But again, I don't think that question needs to be confronted or answered in these cases. Sotomayor, do you have any evidence that in the 20 jurisdictions that permit this challenge, that they've been overwhelmed with cases? Your Honor, there – I think there are two responses to that. First of all, we don't agree with that count of jurisdictions or how it breaks down. But second of all, Petitioner does – does point to jurisdictions in which this exception was made, but he doesn't link that up with evidence that this is not occurring, that the harassment and the effects on full and fair deliberation are not being heard. Well, you can't prove a negative. That's true. So that's almost impossible. Sotomayor, so I want you to tell me the positive. Is there evidence of some run-amok sort of number of motions filed in any particular case based on racial discrimination, rampant jury harassment, any of the evils that you are predicting in your brief? What we do have, Your Honor, is specific examples in these particular cases where harassment is a very real problem, specifically with respect to racial bias, where after all 12 jurors or a large number of jurors are pulled into the courtroom, it's determined that the affidavit at issue was manufactured by the attorney and that the allegations were untrue. And an example to give is the LaGear case from Massachusetts. The other thing I'd say is that the Iowa rule, the most permissive version of the no impeachment rule, certainly was on the table in 1975 when this Court and Congress considered adopting Rule 606B. All of those arguments were the same then. All of those arguments were made in Tanner and made in Warger. And what Congress in this Court decided, and the vast majority of States decided, was that the strict version of the no impeachment rule best balances these interests. And it's a very difficult balance. We certainly acknowledge that. But as to Petitioner's count, six States apply that Iowa rule. And certainly that's their judgment to make. But that doesn't mean that the exception is limited only to racial bias. And six States that acknowledge a Sixth Amendment exception, they don't apply a categorical rule that allows evidence of racial bias to come in in every case in which it's alleged. They apply sort of an extreme cases test. And most often they don't. Ginsburg. Ginsburg. Can you just clarify something? I think Mr. Fisher told us that in the States, whether his number of 20, yours of 6, is right, that this is limited to race. So it would not be applied to gender, sexual orientation, and apparently national origin other than Hispanic. Justice Ginsburg, that is true, that the cases that we've seen do only deal with racial bias. But we've seen extreme instances of other types of bias, religious bias against Jews and Muslims. And certainly I think those courts would have a hard time not extending whatever particular rule they've adopted to those settings. But, yes, we do acknowledge that to date the exceptions have been racial bias. In those jurisdictions, the six jurisdictions that adopt the extreme cases rule, though, even when there is a very disturbing statement that surfaces post-trial, the courts still say, well, the importance of the no impeachment rule still applies here and we are not going to create an exception. Of course, that's exactly what the Seventh Circuit did. Sotomayor, what exception would you recognize? As far back as Reed, we have said qualified 606B's predecessors in 606B, Wagner said it, there might be a case so extreme that we would not apply this rule. If race is not so extreme, what in your judgment would be? Your Honor, I think the line that could be drawn consistent with that footnote would be whether or not the other safeguards that are necessary to assure a fair trial were made available in that particular case. So, for example, there are cases in which voir dire on race or religious bias was not made available. That would be a case in which if evidence surfaced post-trial that that kind of misconduct influenced the deliberations, an exception might be necessary. The same if a court was given some hint that bias crept in to the jury deliberations and didn't do anything about it. That would be possibly a situation in which the no impeachment rule should yield. But if we are focused on that balance between the two. Sotomayor, we don't permit or require questioning on bias except for race in voir dire, so where does your exception work? Because things do creep in, but we don't make exceptions for those things. Well, I think that's precisely right. We don't make exceptions, and we expect counsel in voir dire to be the mechanism through which we explore all of these biases. And so when it is not taken advantage of, when it could have been taken advantage of in this case in the trial court. The problem is it assumes that if the question is asked that every juror is going to be truthful, you know, different people can have different experiences. But, you know, it is more rare than common that when a question is asked, is anyone biased, that most jurors won't raise their hand. And, Your Honor, I think the same challenges arises with regard to nearly any bias that is crucial to a defendant's Sixth Amendment rights, which is precisely why the practice guides the defendant himself cites, or Petitioner himself cites, say asking the general question is generally not the best way to expose those types of biases during voir dire. And here, not even the general question was asked about the race of the defendant in this case. Roberts, what other types of questions would you propound if you were trying to elicit whether there was bias on the part of a prospective juror? I would propound the same types of questions that Petitioner's counsel used below as to other issues. People's experiences on the subject, whether they believe racial issues still persist in this country and what their attitudes are. It's just that it's not that many lawyers won't ask that question, even if they could. Because just by asking the question, you are putting race in the minds of the jurors, and you would rather not do that. That's certainly the argument that Petitioner makes here, but what experience has shown is that a careful and mature voir dire on race is not likely to infuse racism into jurors. In fact, quite the opposite has been observed to happen. When jurors are respectfully confronted with racial issues at the outset of a trial, they tend to counter any racial bias, whether explicit or implicit, that might come up during the thought process. And so the question is, how do you know that? That's the research that we cited from Professor Summers in the briefing. Courts have looked at that research, the McCowan case from Massachusetts. They said precisely the same thing. Voir dire is a good time and a good mechanism to raise these issues to ensure that they don't prop up. Roberts. Roberts, that's one of the problems here. It may be a good time to alert people who have this bias not to talk about it. It seems to me that that's a very hard thing to measure, this sort of bias. And, I mean, one question, I guess, is whether impeaching the verdict in this way will cause people with biases like that to keep quiet about it and yet still have the same sort of pernicious effect on the verdict. Well, and that's one of our concerns, Mr. Chief Justice. And Petitioner acknowledges, I think it's page 16 of his reply brief, that allowing this type of inquiry only on issues of racial bias might, in fact, drive racial bias underground. Now, he says that's unlikely. The Florida Supreme Court said it might happen. And it strikes us, and it strikes Colorado, that if the effect of a racial bias-only exception to the no impeachment rule drives racism underground where it can't be confronted and it can't be reported to the judge, the balance that Colorado strikes by not carving out subject matter exceptions to the no impeachment rule is a good one. And it's precisely what we're looking for. Sotomayor, isn't, you know, there's a lot of talk about political correctness or not, and some people think it's a negative thing and others think it's a positive thing. But if an individual is harboring racial bias, isn't it better to harbor it than to infect the whole, everyone else's deliberations on the basis of it? I mean, if you're not saying every Mexican commits this kind of crime, but you're forced to argue the evidence to convince your jurors, isn't that exactly what we want? Don't we want deliberations on evidence and not deliberations on someone's stereotypes and feelings about the race of a defendant? That is absolutely what we want. Sotomayor, so why shouldn't we try to drive it underground? Well, Your Honor, with respect, I think that if the juror harbors that bias and is on the jury, that's going to influence the verdict one way or the other. And I don't think it's true. Ginsburg, did the jurors even know about the existence of the Vays de Laval rule? I mean, that jurors can't impeach their verdict. Justice Ginsburg, what jurors do know when they enter the deliberation room is that that's a secret proceeding, and they're told after they leave that they can talk to people as much or as little as they want about what goes on in the jury room. So calling them back in and calling multiple jurors back in to take the stand under penalty of perjury and cross-examination to be examined about what was said during those deliberations will have a significant effect on the deliberative climate in the jury room. Kennedy, can you tell me, just as a matter of what goes on in the bar in your State in Colorado particularly, I take it that in civil cases, lawyers who may be trying a similar case all the time question the jurors after the fact, after the verdict, in order to see how to improve their arguments, et cetera, et cetera, in civil cases and criminal cases. Is this a problem generally and a related question? Are there articles and statistics about the prevalence of this and whether or not this is disruptive to the legal system? The specific post-trial sort of conversation between counsel and jurors? I haven't seen anything like that. That is a common practice in the State of Colorado. But one concern is that certainly a skilled lawyer in every case is going to present evidence of alleged bias, as if it were volunteered to that attorney. And it's only after actually inquiring of the jurors, putting multiple jurors on the stand to get to the bottom of those allegations, what was said, when it was said, and what it was meant in context, will you get to whether this actually exposed racial bias on the part of a juror or whether it was something else. And by that point, you have done exactly what Rule 606B seeks to prevent courts from doing in order to create the atmosphere of full and fair debate in the jury room. Ginsburg. When this rule was first pronounced, they were thinking about quotient verdicts, coin flipping, perhaps drunkenness. Identity bias didn't figure in the back in England when this rule was first articulated. Certainly, that might be true at the time the common law rule was announced. But Rule 606B was debated and adopted in the 1970s recently. And since that time, no rulemaker has decided to draw lines within the rule based on the subject matter of the misconduct of the juror. And I think that reflects the tension that we were talking about earlier, which is it doesn't matter what kind of bias arises in the course of proceedings. All of it has significant Sixth Amendment concerns for individual defendants. And drawing the lines only as to racial bias, but to no other type of misconduct, would disserve the rule and wouldn't give an adequate reason not to draw further lines down the road. And I think that would lead to the constitutionalization of the most permissive form of the rule, the Iowa rule, which this Court and Congress and the vast majority of States have rejected. Your Honors, if there are no further questions. Roberts Thank you, counsel. Ms. Kovner. Kovner Mr. Chief Justice, and may it please the Court. Racial bias is a real problem that the United States is committed to eradicating. But there are ways to address that problem without undermining structural protections of the jury system that have withstood legal challenges for hundreds of years. I take Petitioner's principal submission here to be that a different rule should apply under the Sixth Amendment when a particular form of bias is at issue. And I just want to take a moment to underscore how that's really without foundation in this Court's cases and would rear them. Kagan Well, Ms. Kovner, I mean, it seems that there are two lines of cases which we've recognized, that racial bias in a jury room is an especially important problem, and that there need to be special rules to address that problem. The first line of cases is the ones that, on voir dire, say that a lawyer who wants to ask about racial bias, on voir dire, has to be able to ask about racial bias, and that we've applied to nothing else except for racial bias. And the second is the Batson line of cases, where we've said we're going to prevent lawyers from doing what we otherwise allow them to do when striking jurors will lead to or may lead to race bias in the jury room. Now, here we have, like, screaming race bias in the jury room. We have the best smoking gun evidence you're ever going to see about race bias in the jury room. And notwithstanding that in these two lines of cases, we've said there need to be special rules to address this prevalent and toxic problem in our criminal justice system. Here, we're not going to do that. And the question is, why would this category of cases be different from those other two? So, Your Honor, we think this Court has never treated some Sixth Amendment violations as more serious than others. And to talk about these two lines of cases that Your Honor raises, if Your Honor looks, I think, at what the Court was doing in the voir dire cases, race was the particular issue that it confronted there, but it was indicating, and it's indicated in other cases, you have to conduct the kind of voir dire that's reasonably calculated to detect the biases that may be present in a particular case. So those particular kinds of case involve the high risk of racial bias, and that's why the Court said voir dire on race is required there. And to, I think, answer the question Your Honor asked of co-counsel, I think the Court has applied that principle in other contexts. In the capital context, the Court has indicated under the Sixth Amendment, you sometimes need to ask questions about ability to consider mitigation evidence. And lower courts have said that same principle requires voir dire on other topics. And then the second area, Your Honor raises, is the equal protection area. And we think even there, the Court has not distinguished among different types of constitutional violations and said we're going to treat some violations of the Constitution as particularly serious. What the Court said in those cases, we think, Your Honor, is that there has to be special care taken when the government acts based on race. And so some conduct that wouldn't be unconstitutional at all if it were taken based on some other criteria is unconstitutional when it's taken based on race. Breyer, The reason, I think, would be the Sixth Amendment says, in all criminal prosecutions, the accused shall enjoy the right to a trial by an impartial jury. I agree with you that racial comments in the room can be equivalent to other comments. But there may be, that's what I wanted to know, a prophylactic aspect, that if you want impartial juries in general, you have to deal with the problem of racial confidence in the work of the jury. And that's a reason stemming from the language of the amendment to treat race specially. And we have 20 States that have done so without the reasons for limitation swamping the process. Now, that's what I understand is a textual argument and purposive that would in fact allow constitutional protection of the kind they're asking for. So I think when considering, I think, Your Honor, when considering a prophylactic approach to preventing Sixth Amendment violations, it's important to consider both the costs of this rule and the other alternative mechanisms that are available, because those are things that the Court has traditionally considered under the Sixth Amendment. So turning to that with respect to race, we think the prophylactic mechanisms that the Court has relied on are likely to be particularly available in many cases with regard to race. And to talk about first, voir dire, and then the in-trial mechanisms that Your Honor mentioned. So in voir dire, as Justice Kagan's questions alluded to, there's a well-settled principle, and it's the law in Colorado, that you are going to have the opportunity to ask these questions about race. And there's also been a lot of study and thinking that's gone into how to effectively detect bias with respect to race in particular. And then Your Honor alludes to mid-trial reporting. Now, things can be done to strengthen that safeguard. I think Your Honor alluded to some of the things that can be done about particular instructions. But in general, jurors are instructed that this kind of bias in general is impermissible, and they can be instructed that racial bias in particular is impermissible, and even to contact the judge. On the cost side of the ledger, Your Honor, this Court has always recognized that there's a very high danger and a fair trial danger. If you are trying to reconstruct after-the-fact jury deliberations with a sort of he-said-she-said about what was said, that that can really undermine confidence in the jury system. And we think that that risk may be particularly acute when you're talking about a very sensitive allegation like that racial bias occurred. And I think we know, as time goes on, that racial bias can be expressed in subtle ways, and particularly after a jury verdict is rendered and somebody goes back into the community where a sensitive issue has been debated, and they're trying to recall what was said, there's the real risk that there will be these kinds of credibility battles. Kennedy, so the more insidious the evil, the less reason we have to be more cautious we should have in inquiring of the jury? No, we just think that the court has always applied, but we think that to the extent that the court has recognized dangers, they're present here. And so to take, for instance, the danger of impeding full and fair jury room deliberations, we think that's a particular risk when you're talking about this kind of very allegation that contains a very high degree of social opprobrium attached to it. So, Your Honor, I mean, there may be cases in which race is discussed in the jury room because it's appropriate, because the claim involves racial bias, because there's allegations surrounding police misconduct in which race is often discussed. And that's different from, for example, coin flipping or intoxication where there's never going to be any reason why those things should go on. This is really the kind of allegation that's most likely, that opening the door to is most likely to impede full and fair debate in the jury room. And that's one of the considerations. Kagan it does strike me, though, that given that one of the rules is that a juror can, during deliberations, say something inappropriate is happening here, to the extent that there is this chilling effect, why doesn't that produce the exact same chilling effect? I mean, it seems like it's such on the margins what you're saying. I think, you know, for hundreds of years courts have treated the midtrial context as different, and I think a reason why is that in midtrial reporting, you're really talking about something that sets off jurors' alarm bells at the time. Once the trial is over, not only do you have other interests kick in, in finality and tampering and harassment, but there's also just really the risk that jurors regret their decision in a case, they start to second-guess what they did, and as a result they start to misremember or they're subject to community pressures that aren't present when the trial is occurring. Your Honor, we're not suggesting that this is not a serious issue, and even one that jurisdictions, including this Court, when it sits as a rulemaking body, can study and consider. It's a difficult balance, but what this Court has generally said with respect to rules of evidence is that States have a lot of flexibility to adopt different approaches. And we think this is a case in which the interests that the rule serves are fully present and the safeguards that the rule has relied on historically are fully present. And so the Court can't do that. Kennedy, like the Government of the State of Colorado, the Government of the United States, would make this same argument in a capital case? We think that capital cases do present Eighth Amendment considerations that are not present here. The Court has often suggested under the Eighth Amendment different sets of rules apply, and there may be different considerations in that context. But, Your Honor, we think to the extent the Court regards the rule as problematic or as one that deserves further study, the appropriate way to do that is as a rulemaking body, which is another way in which this Court considers and continually exercises oversight as the rule of evidence. But it shouldn't impose a new constitutional rule that requires setting aside a historic structural safeguard. Ginsburg, are the states that allow this kind of evidence, is it all done by legislation or by rule of court, or has it come about by judicial decision? I think it's a mix. Some of these jurisdictions are jurisdictions that employ basically the Iowa rule, so they let in a lot of evidence about what was said in jury deliberations. They just have a broader rule. Some have said under our State law, we think this is an exception that has to exist to the rule, and some of the decisions on which Petitioner relies are constitutional decisions. If I could just add to that, I'm sorry. Alito, the issue of a capital case could involve all sorts of misconduct in the jury room. So suppose it came out later that the jurors at the penalty phase in the capital case said we don't really care what the law is, we just want to impose capital punishment, or they flipped a coin. Would you, if there were a special rule for capital cases, would you draw the distinction based on race? I don't think so, Your Honor. I don't think that if there were a capital rule, we think it would go to whether it's permissible to apply Rule 606B as a general matter in this context. Thank you, Your Honor. Thank you, counsel. Five minutes, Mr. Fisher. Thank you. I'd like to make four points, please. First, just to pick up where that conversation left off, to the extent my friends on the other side are saying that in a capital case the Eighth Amendment would become relevant, that's exactly the kind of common-sense structural constitutional argument that we're making and the other side is suggesting is improper, that when you look at the Sixth Amendment right to an impartial jury, you also consider other elements of the Constitution, like the Fourteenth Amendment. Secondly, with respect to the prophylactic measures that the other side propounds, and specifically Vordeer, two points. First is, the studies they point to are studies where race is already infused in the case from the outset. Cases like Ham v. South Carolina, where the defense is all about the person's race. And in those settings, questioning of Vordeer is almost incumbent on defense lawyers and sometimes has some good effect. But that's not what the question really before the Court today is. If they're saying that Vordeer is a cure-all for this situation, what they're saying is that in every single criminal case, it's shoplifting, whether it's white-collar crime, whether it's a DUI, any case a defense lawyer is in, is really required to interject race into the case from the outset. And so, as between interjecting race into the case from the outset, potentially offending jurors, potentially suggesting race is relevant where it doesn't exist, and our solution, which is just simply having a constitutional fail-safe for the once-in-a-blue-moon where you have this grave problem, we think our solution actually does a lot less upheaval to the system than an opinion from this Court that says Vordeer is the answer here. Next, let me say something where we agree with the other side. I think I heard both counsel for the other side say this is a balance. And we agree. That's what the Court says cases dictate, and that's what 606b itself strikes, is a balance between the interests of justice and the principle of jury secrecy. I would suggest to this Court, though, that when you conduct that balance where we disagree with the other side, and let me use the line from the Solicitor General's brief, they say the Court's duty here is to choose the lesser of two evils. Racial bias is never the lesser evil. The Court has never said that racial bias is a lesser evil than something like the public policy considerations here. And I know the Court is concerned about line drawing. It's obvious in a situation like this where you announce a new rule as a constitutional matter that you're wondering what cases are going to come next. But I respectfully submit that the Court has never refused to remedy intention racial discrimination in the criminal justice system for fear of having to address other questions down the line. And if you look at the Court's cases, whether they're the Ham line of cases, whether they're the Batson line of cases, or anything else, the Court will have ample tools and ample time to decide down the road whether other situations are the same or whether they're different. Our submission here, though, is that race is unique, race is a particular poison, and that the experience of the 20 jurisdictions that have this rule shows that implementing the rule we're asking will not create any significant problems with the spreads of the State interests or the administrators of the rule. Alito, it's not a fear of confronting issues down the road. It's a question of understanding the scope of the rule that you are asking us to adopt. And I'll give you one last chance. You will not tell us today whether your rule applies to discrimination on the basis of religion or gender or sexual orientation or to add another one, political affiliation. So if the jurors, if it came out the jurors said this person is a Democrat, send him to jail, that would be a different result. You will not tell us whether the same rule would apply in those situations. Fisherman, I think it's easy to say, Justice Alito, that categories covered in the Equal Protection Clause by rational basis analysis would not require the rule we're seeking today. I'm trying to be forthright with the Court by saying I acknowledge there will be other hard questions about identity, as Justice Kagan put it. I'm not representing somebody today that has that case, and I think the Court would want full briefing on it. And if I could just return to the term of the question a little bit differently because I understand why you don't want to say, well, it wouldn't apply to this or it wouldn't apply to that. But in what ways is race unique? Fisherman, Race is unique in terms of our history and constitutional structure. And in terms of the more practical considerations of rooting it out with the prophylactic measures we've discussed. The briefing is filled with citations and examples of why race is particularly hard to get at through the Tanner factors as compared to even something like other kinds of discrimination. And the tiers of scrutiny analysis I think is a good place for the Court to look, because it's not that we're saying that other forms of discrimination are okay under the Constitution, whereas race discrimination is unconstitutional. We're saying that different tools need to be available. More searching inquiries need to be done when it comes to race. And that's why we think that the rule of evidence here gives way in a situation where it might not in other cases. Roberts. Thank you, counsel. The case is submitted.